No. 128,977

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

HOUSING AUTHORITY OF THE CITY OF KANSAS CITY,
*Appellee*,

v.

RODERICK MCCONNELL,
*Appellant*.

SYLLABUS BY THE COURT

1.

When a landlord serves a tenant with a notice under K.S.A. 58-2564(a) that they have 14 days to cure an alleged breach or 30 days to leave the premises, that 14-30 notice must meet several requirements. In particular, the 14-30 notice must clearly and explicitly specify any alleged breaches, so that the tenant can understand what steps must be taken to cure those breaches.

2.

A landlord's 30-day notice of the termination of a residential lease (without any curative period) under K.S.A. 58-2564(a) can give rise to an eviction only after a valid 14-30 notice under that statute has been served.

Appeal from Wyandotte District Court; CANDICE ALCARAZ, judge. Oral argument heard on January 6, 2026. Opinion filed April 10, 2026. Reversed and remanded with directions.

*Nicholas Blessing*, of Kansas Legal Services, Inc., for appellant.

*Hale G. Weirick* and *Steve N. Gatzoulis*, of Evans & Mullinix, P.A., of Shawnee, for appellee.

1

Before WARNER, C.J., HURST and BOLTON FLEMING, JJ.

WARNER, C.J.: This case concerns the level of detail a landlord must provide a tenant believed to be in violation of the lease before the landlord may file an eviction action. Under K.S.A. 58-2564(a), if a tenant is in material noncompliance with a term of the lease, the landlord may notify the tenant in writing "specifying the acts and omissions constituting the breach" and informing the tenant that the lease will be terminated in 30 days unless the tenant remedies the breach within 14 days. Courts commonly call this written notification a "14-30 notice."

In this case, Roderick McConnell argues that the district court erred in finding that the Housing Authority of the City of Kansas City, Kansas, provided him with sufficient notice and opportunity to correct the alleged lease violations before filing for eviction. McConnell contends the 14-30 notice he received did not specify how he violated a rule against disturbing his neighbors in their accommodations, rendering the 30-day notice of termination that followed legally infirm. We agree. We thus reverse the district court's judgement in favor of the Housing Authority and remand with directions to consider what relief is appropriate based on the erroneous eviction.

FACTUAL AND PROCEDURAL BACKGROUND

McConnell previously rented an apartment in the Wyandotte Towers, managed by the Housing Authority of the City of Kansas City. When McConnell signed his rental agreement, some of the terms included agreeing to "[n]ot disturb other residents' peaceful enjoyment of their accommodations"; to "act in a cooperative manner with neighbors and the Housing Authority's Staff"; and to refrain from "acting or speaking in an abusive or threatening manner toward neighbors and the Housing Authority's staff."

2

The rental agreement also required the Housing Authority to fulfill certain obligations. For example, before Housing Authority staff could enter McConnell's apartment, the staff were required to provide him with written notice 48 hours in advance. And if the Housing Authority wished to evict McConnell, it was required to provide 30 days' written notice of termination specifically stating the reasons for termination.

In October 2024, the Housing Authority filed a petition to evict McConnell from the premises, stating that it had sent a 14-30 notice to McConnell on August 22, 2024, yet he continued to possess the unit without permission. While eviction proceedings were ongoing, the Housing Authority and McConnell renewed the rental agreement for an additional one-year term. On November 5, 2024, McConnell answered the complaint and counterclaimed that the Housing Authority failed to provide appropriate heating during the previous winter and refused to repair the heating when McConnell complained. The Housing Authority later dismissed this eviction action, but McConnell retained his counterclaim.

During his time as a tenant, McConnell and the Housing Authority staff clashed on several issues, including that McConnell allowed his wife, Sherlynn Chege (who was not listed as a tenant on the lease), to stay in his apartment. On November 6, 2024, a security camera recording showed McConnell going to the Housing Authority's office and speaking to two of the staff. During the encounter, McConnell appeared animated, spoke in a loud voice, and gesticulated. This encounter was captured through a security video in the entryway of the complex, but it is difficult to understand what all is being said on the recording. According to the property manager of the building, McConnell was upset that Chege was banned from the building and used abusive language toward the property manager and other staff.

On November 18, the Housing Authority sent McConnell another 14-30 notice alleging that McConnell had breached the rental agreement because he allowed an

3

unauthorized guest, Chege, to live in his apartment; did not keep his dog on a leash on June 7, 2024; did not maintain his animal in common areas on November 6, 2024; "disturbed the peace of enjoyment for others"; and continued to invite Chege into his unit despite her being banned from the premises. The notice stated that if McConnell did not remedy the breaches in 14 days, his tenancy would be terminated.

Nine days later, McConnell's attorney sent a letter to Housing Authority counsel "as part of a good faith effort by Mr. McConnell to remedy the alleged breaches of the rental agreement." The letter stated that McConnell had remedied all breaches that were specifically defined, including not inviting Chege back to the property and keeping his service dog on a leash. The letter noted, however, that some breaches were not specifically defined thus McConnell did not know what actions served as the basis of the alleged violations. Regardless, McConnell's counsel indicated that McConnell would maintain his dog on a leash in common areas and would "refrain from disturbing any other residents."

On December 3, the property manager went to McConnell's apartment to see if he had cured the breaches listed in the 14-30 notice. A guest who was in McConnell's apartment at the time opened the door and told McConnell "the lady" was there. McConnell was in the bedroom with his home health nurse at the time. McConnell said that there was some "commotion" after the door was answered. Both McConnell and the nurse later testified that McConnell did not give the property manager permission to enter the apartment. But the property manager testified that "[h]e told someone to let me in." She entered the apartment and stood in the entryway. After 10 minutes, she started to "look around and do [her] inspection" and went into the "back area" where she believed most of Chege's stuff was held. At that point, McConnell became angry and told her to leave. She left the apartment and heard McConnell continue to yell after she had gone.

On December 17, the Housing Authority sent a 30-day notice of eviction (what we call the "30-day notice") to McConnell. This notice alleged that on December 3, McConnell failed to cooperate with a "unit inspection"; spoke to Housing Authority staff in an "abusive and threatening manner"; and "disturbed the peace and enjoyment of his neighbors by yelling and disrupting the neighbors while arguing with the housing authority staff." There was no provision in the 30-day notice allowing McConnell to remedy these alleged breaches.

In January 2025, the Housing Authority amended its petition, alleging that because McConnell had received two notices of eviction (the November 14-30 notice and the December 30-day notice), he was unlawfully in possession of the unit. The district court conducted a two-day bench trial in February 2025. The court ultimately awarded $500 in restitution to McConnell for one of his counterclaims but entered judgment in favor of the Housing Authority, granting it possession of the unit and giving McConnell 14 days to vacate. McConnell appealed.

DISCUSSION

The relationship between landlords and tenants in residential housing in this state is governed by the Kansas Residential Landlord and Tenant Act (commonly called the RLTA). See K.S.A. 58-2540 et seq. Among other things, the RLTA codifies several substantive rights and responsibilities of landlords and tenants, specifies when a rental agreement may be ended, and defines when and how a landlord may evict a tenant from a housing unit. *Washburn South Apartments v. Hession*, 65 Kan. App. 2d 626, 632-33, 570 P.3d 126 (2025).

K.S.A. 58-2564 establishes when and under what conditions a landlord may terminate a rental agreement, outlining the steps that must be taken before an eviction case is filed. 65 Kan. App. 2d at 638. The issues in this appeal center on K.S.A. 58-

2564(a), which states that if a tenant is in material noncompliance with the rental agreement, "the landlord may deliver a written notice to the tenant *specifying the acts and omissions constituting the breach* and that the rental agreement will terminate upon a date not less than 30 days after receipt of the notice, if the breach is not remedied in 14 days." (Emphasis added.) This subsection further provides that if the tenant commits the breach listed in the notice "or a similar breach" after the 14-day period, the landlord may notify the tenant in writing "that the rental agreement will terminate upon a date not less than 30 days after receipt of the notice without providing the opportunity to remedy the breach." K.S.A. 58-2564(a).

The district court found that the 30-day notice the Housing Authority sent McConnell on December 3 provided a legal basis to evict him from the apartment. McConnell now challenges that ruling on multiple fronts. He claims that the Housing Authority's 14-30 notice in November—the predecessor to the 30-day notice—did not specify how he "disturbed the peace of enjoyment for others" and thus did not provide him with sufficient notice to allow him to cure the alleged breach. McConnell also argues that there was insufficient evidence to support the eviction. After carefully reviewing the record and the parties' arguments, we agree that the 14-30 notice was insufficient, rendering the later 30-day notice invalid.

Our state's appellate courts have long held that a 14-30 notice should clearly and explicitly specify any alleged breaches, so that the tenant can understand what steps must be taken to cure those breaches and remain on the premises. A notice is insufficient if it is "'ambiguous, misleading, and unintelligible to the average person who is to be affected by it.'" *Fenn v. Windsor at Kingsborough, Inc.*, 226 Kan. 653, 656, 603 P.2d 188 (1979) (quoting 58 Am. Jur. 2d Notice § 23, p. 505).

In *Fenn*, the 14-30 notice provided by the landlord did not include any reference to a 14-day window for remedying the breach—stating only that the tenants had 30 days to

surrender possession of the property due to their "'continuing loud and disruptive behavior.'" 226 Kan. at 656. The Kansas Supreme Court found that the notice did not comply with the statutory requirement that the written notice specify "(1) the [act or] omission constituting the breach; (2) the 30 day termination of the lease; and (3) the right to remedy the breach within 14 days." 226 Kan. at 656 (referencing K.S.A. 1978 Supp. 58-2564[a], which is materially the same as K.S.A. 58-2564[a]).

While the Housing Authority's 14-30 notice to McConnell on November 18 properly informed McConnell of his general right to remedy the breach, the notice failed to "specify the acts and omissions constituting the breach." K.S.A. 58-2564(a). The notice did not include the date of the alleged violation, nor any description of the act to which the Housing Authority was referring. Instead, the notice merely cited a vague disturbance of "the peace of enjoyment for others," without specifying any facts regarding who was involved, what occurred, or where and when the disturbance happened. This is patently insufficient under K.S.A. 58-2564(a).

The Housing Authority argues that there was sufficient detail in the 14-30 notice because it was "issued less than two weeks after the incident" on November 6, 2024 (when McConnell argued with Housing Authority staff in the office), and thus McConnell should have known what act the notice was referring to due to the proximity in time to that incident. But we disagree. Indeed, the letter from McConnell's attorney indicated that it was unclear what the notice's language relating to a disturbance referenced, and the Housing Authority never answered this inquiry. Nor does the notice provide sufficient information so that a court could assess whether the alleged breach had been cured. In fact, the notice specifically identifies dates for two other alleged breaches but remains silent as to the circumstances surrounding the disturbance. As a panel of this court observed previously in *Hill City Housing Authority v. Nevins*, No. 126,274, 2024 WL 3466559, at *5 (Kan. App. 2024) (unpublished opinion), "from an objective standpoint, the notice fails to precisely identify the grounds for termination."

7

K.S.A. 58-2564(a) states that a 30-day notice (without any curative period) can give rise to an eviction only after a valid 14-30 notice has been served. Then if a tenant commits the same "breach or a similar breach" after the 14-day period, the landlord may notify the tenant in writing "that the rental agreement will terminate upon a date not less than 30 days after receipt of the notice" and may do so "without providing the opportunity to remedy the breach."

The 30-day notice alleged that on December 3, 2024, McConnell: (1) failed to cooperate with a "unit inspection"; (2) spoke to Housing Authority staff in an "abusive and threatening manner"; and (3) "disturbed the peace and enjoyment of his neighbors by yelling and disrupting the neighbors while arguing with the housing authority staff." The only allegation that might constitute a "similar breach" as any described in the November notice is the third violation—that McConnell disturbed the peace and enjoyment of his neighbors on December 3 (when the property manager entered McConnell's apartment without his permission to check for compliance with the 14-30 notice). And as we have already established, the Housing Authority's 14-30 notice did not sufficiently specify the basis for that allegation.

Because the 14-30 notice did not specify the acts in which McConnell "disturbed the peace of enjoyment for others," the 30-day notice that followed was legally deficient. See K.S.A. 58-2564(a). The Housing Authority did not properly notify McConnell of the breaches it alleged as the basis for terminating his lease.

Because the 30-day notice—the basis for evicting McConnell—was invalid, the district court lacked legal authority to evict him from the premises. We thus reverse the district court's judgment.

McConnell raises a few other arguments under his first issue, mainly that the 14-30 notice also did not comply with the lease itself and with the specificity requirements of federal housing laws. McConnell also argues that there was insufficient evidence to support the eviction. Because we have already determined that we must reverse the district court's judgment, consideration of these remaining arguments is unnecessary.

Before closing, we pause to note that McConnell has requested reinstatement of his lease as a remedy for the erroneous eviction. But McConnell did not request a stay of the district court's order. As a result, McConnell was evicted from the apartment and now lives in another residence, and his former apartment is no longer available. Under these circumstances, it may not be feasible to render McConnell the relief he requests. We therefore remand the case to the district court to determine what relief is appropriate in light of the erroneous eviction. See, e.g., K.S.A. 58-2563 (stating tenant who has been improperly evicted may recover one-and-a-half months' rent or actual damages sustained by the tenant, whichever is greater).

Reversed and remanded with directions.